IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE GALVAN, et al., | No. CIV S-10-2257-GEB-CMK |
| Plaintiffs, | |
| vs. | FINDINGS AND RECOMMENDATIONS |
| AMCO INSURANCE COMPANY, | |
| Defendant. | |
| _____/ | |

      Plaintiffs, who are proceeding pro se, bring this civil action.[1]  Pending before the court is defendant's unopposed motion for summary judgment (Doc. 7).

**I.  BACKGROUND**

      Defendant offers the following factual summary, which is undisputed:

      A.    <u>The Fire at Plaintiffs' Restaurant</u>

      On August 24, 2008, a fire damaged the restaurant of Plaintiffs Jose Galvan and Laura Galvan, doing business as "Las Palmas Mexican Restaurant" (collectively, "Plaintiffs"), which was located at 4 Sutter

---

[1] The action was originally filed in state court and removed under this court's diversity jurisdiction.

1

Street, #B, in Red Bluff, CA. (Undisputed Material Fact ("UMF") No. 1.) They reported the fire to AMCO later that day. (Decl. of Roessler, ¶3.)

### B. AMCO's Adjustment of Plaintiffs' Claim

On August 25, the day after the fire, AMCO adjuster Helen Basinger visited the site and advanced Plaintiffs $10,000 for the loss of business personal property. (UMF No. 2.)

On August 27, AMCO adjuster Shawn Roessler visited the site with Mr. Galvan, fire cause-and-origin expert Scott Mitchell, insurance agent Gloria Houston (of the Alan Eddy Insurance Agency in Red Bluff), and J.D. Ellison, the Red Bluff City Building Director. (Decl. of Roessler, ¶6.) Realizing that Plaintiffs could not operate the restaurant in its damaged condition, Ms. Roessler suggested that they try to relocate elsewhere in town or as close as possible to their then-present location as the quickest way to get back into business. (*Ibid*.)

Ms. Roessler retained the accounting firm of Hagen, Streiff, Newton & Oshiro ("HSNO") to assist in determining Plaintiffs' business income loss. (UMF No. 3.) She also retained Mike Kirby of Kirby & Associates to assist Plaintiffs in preparing an inventory of business personal property damaged or destroyed in the fire. (UMF No. 4.) Also, Ms. Roessler retained attorney Irene Yesowitch of the law firm of Long & Levit to assist with insurance coverage issues. (UMF No. 5.)

On August 28, Ms. Roessler prepared an estimate for debris removal in the amount of $4,898. (Decl. of Roessler, ¶8.) Ms. Roessler issued a check to Plaintiffs in that amount. (UMF No. 6.)

In a footnote, defendant adds:

Because the estimate exceeded the insurance policy's limit of $4,500 for debris removal, Ms. Roessler noted that she would issue a check to the Galvans for $4,898 and then make an adjustment upon receipt of their inventory to show that the debris removal limit was paid. (Decl. of Roessler, ¶8.)

Defendant continues its summary of the facts as follows:

On October 14, Mr. Kirby submitted Plaintiffs' inventory of business personal property damaged or destroyed in the fire, which totaled $100,410.32. (UMF No. 7.) Even with a reduction for depreciation, the loss exceeded the policy's enhanced limit of $90,493.40 (footnote omitted); thus, Ms. Roessler arranged for the issuance of a check to Plaintiffs in the amount of $80,493.40 (the enhanced limit of $90,493.40 less the previously-issued advance of $10,000). (UMF No. 8.)

By a letter dated September 30, the public adjusting firm of Alan White & Associates, which was then representing Plaintiffs, wrote to Ms. Roessler and submitted Plaintiffs' claim for "extra expenses" under the policy in the amount of $334,193.82. (Decl. of Roessler, ¶10, Ex. 2.)

///

Ms. Roessler noted that Plaintiffs' claimed "extra expenses" consisted of over $21,000 in stainless steel work, over $256,000 in new equipment and the installation thereof, more than $52,000 in building modification work, and $3,000 in advertising expenses; she noted further that of all those claimed expenses, only the advertising appeared to be covered under the "extra expense" provision of the insurance policy. (Decl. of Roessler, ¶11.)

On October 20, Ms. Roessler wrote to the public adjuster to advise that she could not make any payment toward Plaintiffs' extra expense claim at that time, except with respect to the advertising expense of $3,000. She cited the insurance policy's "extra expense" provision, which conditioned payment of such benefits on the extent to which those expenditures reduced the amount of business income loss, and explained that, as of that date, AMCO had no financial information from Plaintiffs that would show that their claimed extra expenses had reduced the amount of benefits due under the policy for lost business income. (Decl. of Roessler, ¶12, Ex. 3.)

On November 17, Plaintiffs' public adjuster wrote to Ms. Roessler to disagree with AMCO's position regarding Plaintiffs' extra expense claim. He contended that the submitted expenses met the Policy's definition of "extra expenses" because as they were incurred so as "to continue 'operations . . . [at] a replacement premises, . . . including relocation expenses and cost to equip and operate the replacement . . . location." (Decl. of Roessler, ¶13, Ex. 4.)

On December 16, Ms. Yesowitch wrote to the public adjuster, pointed out that his reading of the policy's definition of "extra expenses" was incomplete, and explained why AMCO's position with respect to Plaintiffs' "extra expenses" claim was consistent with the policy's provisions. (UMF No. 9.) Plaintiffs' public adjuster did not respond to Ms. Yesowitch's letter. (UMF No. 10.)

Also, on December 16, HSNO advised Ms. Roessler that it had determined, based on its analysis of the financial books and records of "Las Palmas Mexican Restaurant" that Plaintiffs had made available, that had the fire not occurred Plaintiffs would have netted $19,747 in business income in the 12 months after the fire, from August 24, 2008 (the date of the fire), to August 23, 2009. (UMF No. 11.) The HSNO report was provided to Plaintiffs' public adjuster. (UMF No. 12.) Ms. Roessler then arranged for the issuance of a check to Plaintiffs in the amount of $8,716, representing the pro rata amount of lost business income from the date of the fire through January 2009, plus $3,000 for their advertising extra expense. (UMF No. 13.)

On February 18, 2009, Ms. Roessler issued a check to Plaintiffs in the amount of $1,513, representing that month's lost business income. (UMF No. 14.) By letter dated June 5, 2009, Plaintiffs' public adjuster agreed that HSNO's calculation of Plaintiffs' business income loss was undisputed. (UMF No. 15.) On July 20, Ms. Roessler arranged for the issuance of a check in the amount of $9,518 for the balance Plaintiffs' business income loss. (UMF No. 16.)

///

At no time did Plaintiffs or the public adjusting firm representing them submit new or different information to AMCO regarding Plaintiffs' claimed loss of business income or otherwise object to the policy benefits paid. (UMF No. 17.)

On August 24, 2009, the one-year anniversary of the fire, Ms. Roessler wrote to the public adjuster, noting the earlier payment of the balance of policy benefits for lost business income and requesting that he advise whether he was in agreement that all such benefits had been paid. She indicated that if she did not hear from him within 30 days, she would assume that he agreed and that Plaintiffs had no further claims to submit. (Decl. of Roessler, ¶22.) The public adjuster did not respond to that letter. (UMF No. 18.)

Having received no further communication from the public adjuster, on September 20, 2009, Ms. Roessler wrote to him to advise that AMCO believed all issues related to Plaintiffs' claim had been resolved and it therefore was closing its file. She invited his immediate response if he disagreed. She also advised that, under the terms of the Policy, if the Galvans believed they were due additional benefits they had until September 25, 2010, to file suit. (Decl. of Roessler, ¶24.) Again, the public adjuster did not respond to that letter. (UMF No. 19.)

Plaintiffs filed this lawsuit on July 16, 2010.

As to the insurance policy, defendant states that the police provided coverage for "business personal property," with a policy limit of $90,000 (increased by endorsement to $90,493.40), $4,500 for debris removal, actual business income loss and expenses for up to a year. The policy did not cover the building which housed the restaurant, or the physical space within the building. While the plaintiffs leased the restaurant space, the landlord was not listed on the policy as an additional insured.

## II. STANDARDS FOR SUMMARY JUDGMENT

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Under summary judgment practice, the moving party

> . . . always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

4

"[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary

judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. See Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

### III.  DISCUSSION

In its motion for summary judgment, defendant primarily argues: (1) it did not breach any of the express terms of the insurance policy; and (2) it did not breach the implied covenant of good faith and fair dealing. According to defendant, absent a breach of the express terms of the contract, there can be no breach of the implied covenant of good faith and fair dealing. Defendant also contends that it could not have acted in bad faith as a matter of law because there was a genuine coverage dispute and it's position in the dispute was reasonable. Defendant further contends that it is shielded from any liability because it relied on the advice of counsel in taking its position on coverage.

///

Under California law, in order to establish breach of an insurance contract, plaintiffs must establish either that defendant withheld benefits due under the express terms of the policy, or unreasonably delayed such that the claim was essentially denied. See McCormick v. Sentinel Life Ins. Co., 153 Cal. App. 3d 1030 (1984). Defendant argues that, in this case, it paid all of the benefits due under the contract within a reasonable period of time and that, for this reason, as a matter of law plaintiffs cannot establish a breach. Specifically, defendant asserts that it paid plaintiffs' claim for economic loss in full based on documentation provided by plaintiff and, therefore, plaintiffs were not entitled to any benefits for claimed "extra expenses."

As to the "extra expenses" coverage provision, which is at the heart of plaintiffs' lawsuit, defendant contends that the policy provided no coverage to support plaintiffs' claim for an additional $334,193.82.[2] The policy defined the following three categories of "extra expenses":

1. An expense incurred to avoid or minimize the suspension of business and to continue operations at the described premises or at replacement premises or at temporary locations, including relocation expenses and costs to equip and operate the replacement or temporary locations.

2. An expense incurred to minimize the suspension of business if the insured cannot continue operations.

3. An expense incurred to repair or replace any property, but only to the extent it reduces the amount of loss that otherwise would have been payable under the Extra Expense Additional Coverage or the Business Income Additional Coverage.

Defendant argues that neither of the first two definitions are met in this case because the undisputed evidence shows that plaintiffs terminated business operations.

/ / /

/ / /

/ / /

---

[2] Defendant did, however, pay an additional $3,000 for advertising costs which it determined were covered "extra expenses."

1    The court agrees that neither of the first definitions are satisfied in this case.  First, plaintiffs never took issue with defendant's statements throughout the claims process that business operations had been terminated.  For example, defendant's coverage counsel sent a letter to plaintiffs on December 16, 2008, in which she stated defendant's position that the "extra expenses" provision did not apply because plaintiffs did not continue the operation of the business, and plaintiffs did not respond.  Also, in the December 16, 2008, forensic accounting report prepared to determine the economic losses, HSNO stated that, because the business had been completely shut down, plaintiffs had lost 100% of the revenue that would have been generated had the fire not occurred.  Again, plaintiffs did not take issue with the accounting in general or this statement in particular.

Second, it is clear from the plain language of the policy that the first two definitions only apply where business operations are, at a minimum, suspended as opposed to terminated.  The first definition requires that expenses be incurred to minimize suspension and continuation costs.  The second definition requires that expenses be incurred to minimize suspension costs where the business cannot presently continue operations.  Neither definition provides for coverage where business operations are terminated altogether with no plan of resuming, either at the same location or a different location.

Turning to the third definition, the court also agrees with defendant that plaintiffs' claim does not fall under that provision.  The third definition provided coverage for expenses incurred to repair or replace property, but only to the extent it reduces actual losses payable under either the "extra expenses" provision or the business income loss provision.  As discussed above, plaintiffs did not incur any expenses covered elsewhere in the "extra expenses" provision.  Further, because plaintiffs were paid 100% of their claimed business income loss – as calculated from documents submitted by plaintiffs themselves – any "extra expenses" incurred by plaintiffs cannot be said to have reduced their business income loss benefit.  In other words, "extra expenses" plus actual business income loss cannot add up to more than 100% of the business

income loss. Because plaintiffs received 100% of their benefit for business income loss, they were not entitled to "extra expenses" benefits as well.

Finally, the court agrees with defendant that there can be no breach of the implied covenant of good faith and fair dealing where all the benefits due under the express terms of the policy have been paid. See Love v. Fire Ins. Exchange, 221 Cal. App. 3d 1136 (1990). "Where benefits are withheld for proper cause, there is no breach of the implied covenant." Id. at 1151. For the reasons discussed above, the court finds that plaintiffs cannot prevail on their claims for breach of express contract terms because all benefits due were paid. Therefore, plaintiffs cannot establish a breach of the implied covenant of good faith and fair dealing.

## IV.  CONCLUSION

Based on the foregoing, the undersigned recommends that defendant's unopposed motion for summary judgment (Doc. 7) be granted.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within 14 days after being served with these findings and recommendations, any party may file written objections with the court. Responses to objections shall be filed within 14 days after service of objections. Failure to file objections within the specified time may waive the right to appeal. See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: September 1, 2011

_____
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE